**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MICHAEL RAY WHITE, *Petitioner-Appellant*, <br><br> v. <br><br> CHARLES L. RYAN, Warden, Director, Arizona Department of Corrections; JAMES O'NEIL, Warden, Arizona State Prison - Eyman Complex, *Respondents-Appellees*. | No. 15-99011 <br><br> D.C. No. 3:08-cv-08139-SPL <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Arizona
Steven Paul Logan, District Judge, Presiding

Argued and Submitted October 4, 2017
Pasadena, California

Filed July 11, 2018

Before: Milan D. Smith, Jr., Mary H. Murguia,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Nguyen

# SUMMARY[*]

## Habeas Corpus/Death Penalty

The panel reversed the district court's judgment denying Arizona state prisoner Michael Ray White's petition for a writ of habeas corpus based on ineffective assistance of counsel at resentencing, and remanded with instructions to grant a conditional writ.

Regarding counsel's performance, the panel held (1) that counsel performed deficiently by failing to challenge evidence that White committed the murder for pecuniary gain, and by failing to conduct an adequate investigation of mitigating factors, including the unreasonable decision not to hire any experts to assist with the penalty phase; and (2) that the state post-conviction court's contrary conclusion was an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984), and *Wiggins v. United States*, 539 U.S. 510 (2003).

The panel evaluated prejudice without AEDPA deference because the state post-conviction court applied a test for prejudice contrary to *Strickland*. Reviewing de novo, the panel concluded that there is a reasonable likelihood that White would have received a different sentence if counsel had investigated and presented mitigating evidence.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Jennifer Y. Garcia (argued), Assistant Federal Public Defender; Jon M. Sands, Federal Public Defender; Office of the Federal Public Defender, Phoenix, Arizona; for Petitioner-Appellant.

John Pressley Todd (argued), Assistant Attorney General, Capital Litigation Section; Lacey Stover Gard, Chief Counsel; Mark Brnovich, Attorney General; Office of the Attorney General, Phoenix, Arizona; for Respondents-Appellees.

**OPINION**

NGUYEN, Circuit Judge:

Michael White shot and killed David Johnson ("David"), the husband of White's lover, Susan Johnson ("Susan"). The only question is why. White was initially sentenced to death based on the state court's finding of one aggravating factor—that he committed the murder for pecuniary gain. David had a life insurance policy, and there was some evidence that Susan was going to share the payout with White. After White lost his direct appeal, the state court granted him post-conviction relief as to the penalty phase and ordered a new mitigation hearing and sentencing. During these proceedings, however, White's new counsel abandoned any challenge to the sole aggravating factor relied on by the state court despite compelling evidence that, rather than financial gain, White acted out of love for Susan and killed David only after she repeatedly pressured him to do so. Counsel's failure to challenge the aggravating factor was not based on any strategic decision; instead, it was

simply due to his mistaken belief that the issue already had been conclusively decided in a prior appeal.

Worse still, counsel utterly failed to investigate White's background for mitigating circumstances. Had he done so, counsel would have found abundant and readily available evidence that White was suffering from serious mental illness as well as Graves' disease and its attendant neuropsychological effects. White also struggled with low intellectual functioning and had a troubled and abusive childhood. None of this background evidence was presented at his resentencing hearing. Instead, counsel relied on and presented White's statement to the probation officer that "he had a normal childhood and enjoyed growing up."

White filed a federal petition for a writ of habeas corpus based on ineffective assistance of counsel at his resentencing, which the district court denied.[1] We reverse and remand with instructions to grant a conditional writ. Under similar circumstances, the United States Supreme Court has held that even less egregious lapses by defense counsel violated the defendant's Sixth Amendment rights. The state court's finding that counsel performed reasonably was an unreasonable application of this precedent, and the

---

[1] The district court certified only the portion of White's ineffective assistance claim regarding counsel's failure to investigate and present mitigating evidence. This was error. White has but a single claim regarding his right to the effective assistance of counsel at the penalty phase of resentencing. *See Browning v. Baker*, 875 F.3d 444, 471 (9th Cir. 2017). Because "he 'has made a substantial showing of the denial' of that right," *id.* (quoting 28 U.S.C. § 2253(c)(2)), we grant his request to expand the certificate of appealability to include the aggravation portion of his ineffective assistance claim, which has been fully briefed and argued.

state court's prejudice determination was contrary to *Strickland v. Washington*, 466 U.S. 668 (1984).

We hold White's counsel performed deficiently by failing to challenge evidence that White committed the murder for pecuniary gain, and by failing to conduct an adequate investigation of mitigating factors, including the unreasonable decision not to hire any experts to assist with the penalty phase. Reviewing de novo, we conclude that but for counsel's errors, it is reasonably likely that the result would have been different. This was a relatively weak case for imposition of the death penalty. Even the trial prosecutors believed that the death penalty was inappropriate because this was a "run-of-the-mill" case, Susan was the "mastermind" behind the murder, and White succumbed to pressure from her to commit the crime. White had no criminal record when he committed the murder at age 36, pecuniary gain was the only aggravating factor, and there was substantial evidence that White acted out of love or infatuation rather than profit.

## I. Factual Background

White met Susan in January 1987 when they worked together at a nursing home in Prescott, Arizona.[2] At the time, Susan was in a relationship with David. White was living with another woman, Becky Fisher, whom he had recently married. White began visiting Susan at her home every day, and they began a romantic relationship.

That April, White and Susan went to Michigan, where they lived together and worked at the same nursing home. David apparently felt "burned" by Susan, but still continued

---

[2] All events relevant to White's conviction took place in 1987.

contact with her despite his friends' "serious misgivings." One friend believed that Susan was "taking advantage of him" based on things that David had said.

In October, Susan returned to Bagdad, Arizona, and White to Prescott. They continued their sexual relationship notwithstanding Susan's engagement and subsequent marriage to David. White and Susan spoke on the phone up to six times each day when David was at work, and White was frequently at Susan's house. At a restaurant where White worked for a few weeks that fall, he told a server about his "girlfriend." According to White, he and his girlfriend "were planning on getting married sometime" although "she was living with someone else in Bagdad." This other boyfriend "had money," which White's girlfriend "was going to use . . . to start a business." White said that he and his girlfriend were planning to go to Phoenix, where they would start the business or go to school.

After Susan's marriage, White began to visit Fisher, purportedly to visit their children and "get back with" Fisher, but he used her phone to call Susan. Around November 1, White told Fisher that Susan had asked him to help kill David. He explained that Susan "wanted to be with [him]." White also said that Susan was marrying David "[b]ecause of his money" and that "as soon as David put everything into [Susan's] name . . . something was going to happen to David." Several days later, White admitted to Fisher that he was "confused" and "didn't know what to do" about Susan's request that he kill David. White also told another friend, Carol Sexton, that "Susan was planning to kill David" and "wanted [him] to do it."

In early November, Susan called several insurers about life insurance policies. She called Colonial Penn Insurance in Prescott to inquire about the "time frame on life insurance

policies," and in particular, "when you can receive monies." She also called Mutual of Omaha Insurance in Prescott to inquire about a $100,000 life insurance policy. Susan expressed concern about how long it would take the insurer to pay out if David were accidentally killed in the mine where he worked. Later that month, Susan told the agent that the payout would be enough to open a nursing home in Michigan, where she had family. Susan also arranged with David's employer to add herself and her two children from a previous marriage to David's life insurance policy.

Around November 10, White and Sexton had another conversation about Susan. Susan had told White that David "just took out a big life insurance policy" for $100,000. A few days later, White told Sexton that "Susan still had the crazy idea about killing David, and she still wanted [him] to do it." Sexton "tried to talk [White] out of it." White agreed with Sexton that "you just don't take another man's life."

On November 19, at a pawn shop, White made a down payment on the .357 magnum revolver that he used to kill David. He made a second payment the next day, and on November 27 he returned to pay the remaining balance and pick up the weapon.

Around November 20, when Fisher was upset with White for not making child support payments, he told her that she "didn't have to worry about money" because he would be getting $100,000 from Susan. A few days later he told Fisher that "he didn't get the money." Sometime in November, White asked Fisher if he could stay with her on December 15 and 16 because he "needed a place to stay." When pressed, he admitted to Fisher that "something might happen to David" and he needed an alibi. Fisher refused.

On December 12, at approximately 11:00 p.m., David and Susan's neighbors heard gunshots at the Johnson residence. Neighbors saw a man run from the Johnsons' carport, get into a green car, and drive off. Shortly thereafter, David walked to a neighbor's home, where he collapsed, covered in blood. He had been shot in his chin and lower back with a .357 magnum revolver.[3] Before he died, David stated that his assailant was an unknown man wearing a mask. Susan claimed that David had identified the shooter as her ex-husband, Clifford Minter. Minter's name and the description of the green car were broadcast over the police radio.

An officer on his way to the murder scene stopped a green sedan heading away from Bagdad. White was the sole occupant. White stated that he had just dropped off a companion in Bagdad and was heading back to Prescott. Because the officer was looking for Minter, he let White proceed.

The police soon discovered that Minter was not involved in the shooting and began to focus their investigation on White and Susan. White traveled to Phoenix, where he sold the revolver used to kill David to a pawn shop. While White was staying at various motels in Phoenix, he and Susan made several calls to each other.

White was arrested in Phoenix on December 18. Officers searched his car and found an empty box of

---

[3] These injuries caused only slight blood loss. David ultimately died when his lungs filled with fluid. Although some of the fluid was blood aspirated from his chin wound, other contributing factors were his diminished respiratory reserve from being overweight and the intravenous fluids being given to him that leaked into his vascular system and pooled in his lungs.

.38 caliber bullets, a holster, a ski mask, and a bag of potatoes. They concluded that the murderer had placed a potato over the barrel of the revolver to act as a silencer due to pieces of dried potato with gunpowder particles found at the scene of the shooting and potato starch found on the barrel of the revolver and David's glasses. White's car also contained a glove with human blood stains on it and an envelope. On the back of the envelope was written: "Susie, I love you. We will be careful. I will call soon. Love, Michael."

The police arrested Susan on December 23. While in the booking area of the Yavapai County Jail, she encountered White. He asked her, "is everything still the same, Susie"?

## II. Procedural Background

### A. Trial, original sentencing, and first direct appeal

White and Susan were tried separately on the same charges—conspiracy to commit first degree murder and first degree murder.

White's trial counsel, Chester Lockwood, moved for a competency examination due to his strong suspicion that White suffered from "mental dysfunction." In addition to his strange behavior, White repeatedly disregarded Lockwood's instruction not to discuss his case by communicating with inmates, prosecution witnesses, and others, including Susan's counsel and the prosecutor. The trial court denied the motion without oral argument. The jury convicted White of both charges.

At sentencing, Lockwood presented no mitigation evidence other than the presentence report to highlight White's lack of a prior felony record. Lockwood argued that

White did not commit the murder for pecuniary gain because it was "Susan . . . who wanted the insurance money." Lockwood acknowledged that White "may have benefitted from being with [Susan]," but argued that this fact did not show "that his participation in the murder was for anything other than his love or infatuation with Susan." Lockwood submitted a five-page sentencing memorandum, only half of which addressed the death penalty.

The trial court found that the state had proven the sole statutory aggravating factor alleged—that White committed the murder for pecuniary gain based on the insurance proceeds—beyond a reasonable doubt. The court found no statutory mitigating factors but considered several non-statutory factors: White's lack of a prior criminal record, his natural father leaving home when White was 18 months old, White's alcoholic stepfather, White's substance-dependent personality, his inability to form and maintain close relationships, his employment record, his lack of a record of abusive or violent behavior, and his expression of sorrow for David's death. The court found that these mitigating circumstances did not warrant leniency and sentenced White to death for the first degree murder, and to imprisonment for 25 years to life for the conspiracy conviction.

White's appellate counsel, John Williams, moved the Arizona Supreme Court to remand for appointment of mental health experts to determine whether White was competent to assist counsel. Williams asserted, based on discussions with White, his counselor, and an inmate acquaintance of White's, that White appeared to be "suffering from a severe mental disease or defect which render[ed] him incapable of assisting counsel." Specifically, Williams noted that White claimed that the Arizona Department of Corrections ("ADOC") was "monitoring his

thoughts through some sort of electrical device which [was] somehow tied into the electro-shock therapy machine at the prison"; Susan (who was housed at the women's prison in Perryville) "visit[ed] him outside his cell to taunt him"; and "he knows which portion of his head the electrical apparatus is connected to and is sending counsel a diagram." In addition, White's counselor told Williams that White "is very mentally unbalanced." Another inmate stated that White "has gradually withdrawn from reality since he arrived at [the prison] and that he is engaging in 'VERY bizarre behavior.'" White's "letters to counsel [were] bizarre and . . . of no help in the preparation of his case. In one instance he wrote three letters in one day and stated that he was intentionally closing to 'start a new letter.'" The Arizona Supreme Court denied the motion.

White moved pro se for a medical evaluation because he believed that the ADOC had "implant[ed] a listening device in which they could monitor their victims['] words and deeds." The Arizona Supreme Court denied this motion as well, and affirmed White's conviction and sentence. *See State v. White* (*White I*), 815 P.2d 869 (Ariz. 1991).

## B. First PCR petition

White sought post-conviction relief in the trial court. In May 1992, after attorney Douglas McVay was appointed, he requested the appointment of an investigator and "anticipated that a substantial effort must be made to unearth all mitigating circumstances." The PCR court granted the motion and appointed investigator Arthur Hanratty.

In August 1995, after McVay had been representing White for more than three years, White moved pro se for a new trial. His motion consisted of various factual assertions and diagrams regarding his claimed version of events in

which Susan shot David.  He also claimed that he was being "tortured" while incarcerated.  White's motion was denied.

Like prior counsel, McVay noticed troubling signs of mental health issues. At an October 1995 telephonic status conference, McVay stated, "[o]ne of the difficulties in representing . . . White is I have a three-inch stack of stuff from him that I have some questions, sometimes, and I expressed, sometimes he did not appear to be close to being lucid; other times he seemed to be quite okay."

The PCR court held an evidentiary hearing on White's amended PCR petition, which alleged ineffective assistance of counsel at trial, sentencing, and appeal.

### 1.  Prosecutor Marc Hammond's testimony

Marc Hammond testified.  He and his co-counsel, Jill Lynch, prosecuted White's case.  After the trial, Lynch left the office, and Hammond handled White's sentencing and later Susan's prosecution alone.

Hammond believed that the death penalty was not appropriate because Susan was the "mastermind" behind the crime and White had no prior felony conviction or history of violence or abuse.  Hammond told his supervisor, County Attorney Charles Hastings, that he "felt that White was just a run-of-the-mill loser who hooked up with his co-defendant on the case and that this murder would not have occurred but for the chemistry between the two of them."  Based on the evidence, Hammond believed that White "probably would have gone through his entire life without this kind of an offense" if not for Susan.  Hastings told Hammond that the office policy was to ask for the death penalty in every first degree murder case where aggravating circumstances were

present and to let the judge make the decision.  Hammond felt that he "should follow the policy" or quit.

### 2.  Trial counsel Chester Lockwood's testimony

Lockwood testified that he simply "miscalculated" the potential risk of a death sentence.  He believed "[i]t couldn't be a death penalty case" based on his experience representing the defendant in *State v. Madsen*, 609 P.2d 1046 (Ariz. 1980).  Lockwood "was convinced that [if] White had committed this offense he didn't do it for money," but rather because "[Susan] . . . convinced him to do it."  Had Lockwood appreciated the sentencing risk, he would have handled the case differently, such as developing "lots of other evidence" in mitigation.  After the trial, White's appellate counsel pointed out to Lockwood that "White must have some type of either emotional problem or health-related problems" because "he didn't react to things."  Lockwood stated that at trial he "didn't take any clue" from White's behavior "as to why and how [White] reacted physically certain ways, but, boy, the mannerisms were all there."  In fact, White's behavior "was so obvious" that Lockwood instructed him "not to answer certain ways" that Lockwood later came to think "were psychological or physiological for him."

Lockwood failed to present mitigation evidence due to his "serious miscalculation" about the risk of the death penalty.  Just prior to sentencing, Hammond told Lockwood that the hearing would not be long "[be]cause it's not a death penalty case."  Although Lockwood took this as a statement of Hammond's opinion rather than a guarantee of what the trial court would do, Lockwood "wrongfully formed the opinion that [the court] couldn't give [White] the death penalty."

Lockwood stated that, in retrospect, he would have hired a second defense attorney to develop mitigating circumstances. He felt "there was [a] mitigating circumstance definitely that should have been developed psychologically about . . . White." White's appellate counsel, John Williams, similarly testified that the lack of a mitigation hearing was the "most obvious" sign that Lockwood was ineffective at sentencing.

The PCR court denied White's petition as to the trial claims but granted it as to the sentencing claims and ordered a new mitigation hearing and sentencing. The Arizona Supreme Court subsequently denied review of White's PCR claims regarding ineffective assistance of counsel at trial.

## C.  Resentencing proceedings

### 1.  Mitigation hearing

McVay presented two witnesses at the mitigation hearing: Hammond and White. McVay also submitted an affidavit from Dr. Philip Keen, the Yavapai County Medical Examiner, who had testified as a prosecution witness at trial. Dr. Keen opined that David's wounds "were not fatal" and, but for "intervening medical . . . carelessness, [he] wouldn't have died in the first place." Dr. Keen indicated that the Bagdad Clinic had given David "twice as much [lactate ringer solution] as they should have to replace the blood loss, and that was the immediate cause of the death."

### a.  Prosecutor Marc Hammond's testimony

Hammond reiterated his belief that this was not a death penalty case, but he felt bound by county policy to seek the death penalty, adding that his co-counsel agreed with him. He opined that Susan's punishment, two consecutive 25-

years-to-life sentences, was the appropriate punishment for White as well. Hammond believed that Susan was the "instigator" and "brains behind" the crime, and that "White was having . . . some difficulty making up his mind whether he was going to go through with the conspiracy." White "had spoken to several witnesses" and said things to the effect that "Susan wants me to kill her husband. I don't know what I'm going to do." Hammond did not know what he was thinking when he argued to the court that "there was no evidence that . . . White was the dupe of Susan." Hammond felt it "was pretty clear" that Susan "kept pushing . . . White until he made up his mind to kill her husband."

Although Hammond did not think capital punishment was warranted, he believed that White committed the murder for pecuniary gain and felt it "was well proven in the evidence."

### b. White's testimony

White testified that he tried to be a "model inmate" while on death row. He did not participate in the gangs there. White also discussed his six children. His daughter Isabel, who lived with her mother in Wisconsin, had been experiencing problems—she was raped and some friends committed suicide—which "threw her into a drug situation," and she "tried to take her own life." During their correspondence, White was "able to help her out" because he had "been through a lot of different things in [his] life." He believed he had "saved her life." Isabel and her mother were planning to move to Arizona so that they could be closer to him.

White also was in contact with his other two oldest children, Jeremiah and Matthew. White felt that he could assist them avoid some of the mistakes that he had made. He

had "no association whatsoever" with his three youngest children.

## 2.  Resentencing memoranda

### a.  McVay's memorandum

McVay argued four mitigating factors.  First, he discussed the prosecutors' belief that the death penalty was not appropriate.  He cited the subsequent change in Arizona Rule of Criminal Procedure 15.1—requiring prosecutors to give notice of their intention to seek the death penalty within 30 days of arraignment—as evidence of "the acknowledged role of the prosecutor in determining the appropriateness of the death penalty."

Second, McVay pointed to evidence that White could be rehabilitated.  White had no felony criminal record, did well in his employment in nursing homes despite problems accepting responsibility, was productive during various periods of his life, had no record of prior abusive or violent behavior, and expressed sorrow for David's death.  McVay noted White's exemplary behavior in prison, his contact with his children and assistance to his daughter, and his acceptance that his life would be spent in prison and would have value there.

Third, McVay focused on the gross disparity between White and Susan's sentences.  McVay argued that their culpability was equal because Susan planned the crime and pushed White to commit it.  McVay claimed that the "weight of their mitigating circumstances" was similar because White, like Susan, had no prior record of crime or violence and was a caring parent whose death would likely be "devastating" for his children.

McVay conceded that Susan had mitigating factors that White did not—a difficult childhood, marriage, and divorce, as well as a jury recommendation of leniency. McVay acknowledged White's statement to the probation officer "that his childhood was normal," but added, "one is left to wonder about that conclusion when [White's] natural father left the home when [he] was 18 months old and his first stepfather was an alcoholic." McVay speculated that it was "not inconceivable" that a jury might recommend leniency for White if told the prosecutor's opinion that Susan was the "mastermind" behind the murder who had "pushed" White to commit it. And McVay argued that Susan's additional mitigating factors were balanced by White's potential for rehabilitation.

Fourth, McVay argued that the aberrant nature of White's actions and his lack of a criminal record were themselves mitigating factors.

### b.  White's letters and memoranda

White submitted at least two pro se filings. In a statement dated December 3, 1996, White claimed that the ADOC placed biometric implants in him against his will to transmit and receive electrical signals between his auditory cortex and remote computers in order to monitor his thought processes and cause him to hear voices and other sounds. He believed that the ADOC used the implants as mental and physical torture and that ADOC employees derived sexual satisfaction from these acts. He claimed the implants caused him brain damage and memory loss. White also pointed out that the ADOC had classified him as "mentally unfit" and that he might not have long to live due to his Graves' disease. White argued that he should be sentenced to "time served" as a deterrent so that the ADOC would never again use implants and torture a human being.

In a "Victim Witness Report"[4] dated December 4, 1996, White similarly alleged that he was being tortured with various types of implants, "such as Laser Mic, S, and Telemeters," exposing him to radiation and causing physical and mental damage.  White claimed that since 1988, the ADOC had "raped" his memories and deprived him of all of his privacy because of the "mind to mind contact."  ADOC employees sent him thought signals from the "Implant Projection Room," projected multiple personalities into his mind and forced him to perform sexual and violent acts for as long as six hours.

White believed that for nine years, each of the six "defendant[s]" and "co-conspirator[s]" had forced their thoughts into him, inflicting a total of 54 years of torture on him.  His bones were aging faster than those of a pregnant woman, and he conservatively estimated that he has suffered 32 years of bone loss.  He then calculated that the 54 years of torture plus the 32 years of bone loss, combined with a "Normal sentence Reduction Rate of 18 Years," amounted to 104 years of sentencing relief for which he was eligible.

### 3.  Resentencing decision

The PCR court resentenced White to death, finding "no evidence which would invalidate [its] previous finding . . . that [White] committed the crime of first degree murder for the receipt of something of pecuniary value."  The court

---

[4] White sent pleadings captioned "Witness Report" by "Victim White" to the Arizona Supreme Court, among other recipients, on more or less a weekly basis from at least April to October 1995.  These pleadings alleged similar acts of torture and apparently related to one of several civil lawsuits he attempted to file against the ADOC and various ADOC employees.

cited White's statements that Susan had asked him to help her kill David, that Fisher did not have to worry about child support because he would be getting $100,000, and that he would use the money to start a business. The court also cited its mistaken belief that White and Susan had attempted to collect the insurance proceeds immediately after the murder.[5]

Turning to the statutory mitigation factors,[6] the trial court again found that none were present. The court

---

[5] There was no evidence that they attempted to collect on David's policy, and the prosecutor made no such argument in support of the pecuniary gain aggravator. During trial, Hammond represented to the court that Susan had made an insurance claim, though he and his co-counsel disagreed whether she had done so before or after her arrest. This evidence, if it existed, was never presented to the jury. Although one witness overheard Susan ask White "something about insurance papers" a few days after the murder, the context of this conversation was unclear. More importantly, there was no evidence that White had pressured Susan to collect on the policy that would indicate his interest in (as opposed to knowledge of) the pecuniary gain. *See Madsen*, 609 P.2d at 1053 (overturning pecuniary gain aggravator where the insurance agent, rather than the defendant beneficiary, "brought up the subject of the insurance policy," because "the receipt of the money must be a cause of the murder, not a result of the murder").

[6] Arizona expressly provides that the following non-exclusive circumstances are "relevant in determining whether to impose a sentence less than death":

> 1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution.

considered several non-statutory mitigation factors: White had no record of prior felonies; his natural father left home when he was 18 months old and his first stepfather was an alcoholic; he had "dependent personality traits" and had a history of using and being addicted to heroin, cocaine, and amphetamine; he was unable to form and maintain close relationships; he was "unable to take responsibility well" despite having "done well at his employment" and having "been productive during various periods of his life"; he expressed sorrow for David's death; he had no prior record of abusive or violent behavior; he had tried to be a model inmate since his arrest; his and Susan's relative culpability; he had contact with and was able to help some of his children; he accepted that the remainder of his life would be spent in prison and would have value there; he believed "that he is controlled by biotelemetry implants"; he probably

2. The defendant was under unusual and substantial duress, although not such as to constitute a defense to prosecution.

3. The defendant was legally accountable for the conduct of another . . . , but his participation was relatively minor, although not so minor as to constitute a defense to prosecution.

4. The defendant could not reasonably have foreseen that his conduct in the course of the commission of the offense for which the defendant was convicted would cause, or would create a grave risk of causing, death to another person.

5. The defendant's age.

Ariz. Rev. Stat. Ann. § 13-751(G) (formerly codified at Ariz. Rev. Stat. § 13-703(G) (1996)).

helped his daughter Isabel with her problems; and he believed that he could be rehabilitated.

The court rejected the prosecutors' opinions as "irrelevant." It found that White and Susan's sentences were not disparate because White "was the triggerman [who] planned, plotted, and executed [the] killing." White was criminally responsible for the murder regardless of any fault of the medical personnel because David would not have died but for the gunshot wounds that White inflicted. Finally, the court found that White's "aberrant behavior in connection with [his] rehabilitation argument" was "nonsensical." The court concluded that "there are no mitigating factors which are sufficiently substantial to call for a sentence other than death. The mitigating circumstances are insufficient to warrant leniency."

## D. Appeal from the resentencing proceedings

By a three-to-two vote, the Arizona Supreme Court affirmed the death sentence. *State v. White* (*White II*), 982 P.2d 819 (Ariz. 1999). The majority rejected the trial court's complete dismissal of the prosecutors' opinions about the appropriateness of a capital sentence as "inconsistent with prevailing authority." *Id.* at 825. It nevertheless concluded that the prosecutors' opinions were "easily outdistanced by White's and [Susan's] premeditated scheme to murder David . . . and thereby reap the benefits of his life insurance," which was "an expectation of pecuniary gain in the most classic sense." *Id.*

The majority agreed with White that "the potential for rehabilitation [is] a mitigating factor," but observed that there was "no clear test under Arizona law as to how a defendant might demonstrate [it]." *Id.* at 826. Other cases had relied on expert testimony, the majority explained, but

none was offered by White. The majority agreed with the trial court that White's "own testimony [was] not sufficient." *Id.* The majority concluded that the other asserted mitigating factors carried little or no weight. *Id.* at 827–30.

The dissent argued that the majority, despite recognizing the trial court's clear error in treating the prosecutors' opinions as irrelevant, nonetheless afforded the opinions insufficient weight. Noting that the "pecuniary gain aggravator covers such a wide range of behavior that it easily lends itself to uneven application," *id.* at 831, the dissent would not have applied the aggravator because "death is reserved for the worst of the worst" and "both this crime and its perpetrator fall short of the mark." *Id.* at 832.

Citing "the inflexible policy of the Yavapai County Attorney . . . to automatically seek capital punishment in every case where evidence of at least one statutory aggravating factor was present," the dissent would have "treat[ed] [the prosecutors'] failure to exercise . . . discretion as a non-statutory mitigating circumstance." *Id.* The dissent also criticized the majority's analysis of the sentencing disparity given that Susan "masterminded and solicited the killing of her husband, duping [White] into committing the crime." *Id.*

The United States Supreme Court denied certiorari. *White v. Arizona*, 529 U.S. 1005 (2000). On January 8, 2001, the Arizona Supreme Court issued its mandate.

## E. Second PCR petition

### 1. Protective PCR petition and preliminary investigations

Concurrently with issuing the mandate, the Arizona Supreme Court appointed counsel Daphne Budge to represent White in post-conviction proceedings. Budge filed a preliminary PCR petition on July 5, 2001, to stop the clock on the one-year federal statute of limitations, 28 U.S.C. § 2244(d). The PCR court authorized funding for a paralegal and mitigation expert. Budge was unable to obtain White's trial records because Lockwood had given them to Williams, who was by then deceased. After three years, Budge was replaced by David Goldberg.

### 2. PCR counsel David Goldberg's requests for expert funding

Goldberg moved for $4,500 in funding for neuropsychologist Marc Walter to prepare a comprehensive neurological evaluation of White. Goldberg explained that this evaluation would support a claim of ineffective assistance of counsel at sentencing by showing that White had been "chronically seriously mentally ill since prior to the commission of the murder," which would have been "a major statutory and non-statutory mitigating circumstance."

The ADOC had provided to Goldberg "594 pages of medical and psychological records pertaining to [White] since his initial incarceration in 1988," and "[e]arly progress notes indicate[d] [he] was suffering from paranoia and hallucinations." Medical records further reflected that White was suffering from untreated hyperthyroidism. According to Goldberg, McVay "never bothered to obtain [White's] records" even though he must have known that White was

likely mentally ill given White's several letters to McVay indicating that doctors were prescribing him anti-psychotic medications and containing allegations of torture with brain implants and "other nonsensical ramblings."

The PCR court denied the request, as well as a motion to fund a rehabilitation expert, without explanation. However, the court granted Goldberg's request for additional funding for mitigation expert Keith Rohman.

Upon discovering a school record showing that White had been evaluated with an IQ of 74 as a child, Goldberg moved for appointment of an independent expert to conduct IQ testing. The PCR court denied this motion in part but, at the state's urging, appointed Dr. Ann Herring to conduct an initial IQ evaluation to comply with *Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that execution of the intellectually disabled violates the Eighth Amendment). Dr. Herring reported that White's verbal IQ at the time was 95 and his full-scale IQ was 91, both of which fell within "the low end of the average range." White's performance IQ was 86, which fell within "the low average range." Dr. Herring concluded that White was "of average general intelligence with verbal slightly stronger than nonverbal intellectual abilities."

Goldberg renewed his motion for funding for a neuropsychologist, this time proposing to hire Dr. Herring at an estimated cost of $4,000. Goldberg explained that he was "attempting to prove . . . that prior PCR counsel was ineffective for failing to investigate and present mitigation evidence related to [White's] mental functioning and illnesses." Goldberg was concerned that White's "low average IQ" would "not carry much weight" without an expert such as Dr. Herring to explain it and provide meaning. The PCR court denied the motion without explanation.

### 3.  Amended PCR petition

Goldberg filed an amended PCR petition on May 2, 2005, which included a declaration by Rohman with numerous exhibits.  Rohman believed, based on his 17 years of experience conducting mitigation investigations in capital cases, including regular trainings with mental health professionals, that there were "strong indications of mental and physical illnesses suffered by . . . White."  However, he acknowledged that he was "not qualified to diagnose psychiatric illness, neurological illnesses or damage, or thyroid disease," and did "not have the qualifications to provide expert testimony on the impact of drug and alcohol addiction on . . . White or the impact of thyroid aliments on his behavior."  In every other capital case where Rohman had served as a mitigation specialist, at least one mental health expert—"many times" three or four—was appointed to assist the defendant.

Rohman's investigation turned up 13 categories of mitigation evidence that in his opinion should have been presented at resentencing to show that White's "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law was significantly impaired."

### a.  Hyperthyroidism

In August 1988, while in custody, White was diagnosed with hyperthyroidism stemming from Graves' disease. White was successfully treated with radioactive iodine for several months at the Maricopa Medical Center.

Graves' disease causes symptoms including insomnia, disorganized thinking, paranoia, erratic behavior, mood swings, nervousness, anxiety, and increased heart rate and blood pressure.  White recalled feeling nervous and anxious

most of his life. As he and various relatives recounted, he had stomach ulcers as a child and nervously chewed his fingernails all of the time. He was hyperactive and unable to sit still or focus in school. He had wide emotional swings and explosive fits, and he was always screaming. His school attendance and academic performance slipped during adolescence. His IQ, which measured 86 at age 13 and 91 at age 14, dropped to 74 at age 16. He repeated seventh grade and struggled to finish eighth grade at age 15. He had not finished tenth grade by age 17.

As an older teen and adult, White experienced excess energy. To control it, he engaged in physical activity, sometimes working double shifts or two jobs. His three ex-wives recall him being hyperactive, nervous, and unable to sit still. He slept fitfully and could not seem to "shut down" his mind. His second wife, Ellouise Boettcher, thought that White was insane because of his irrational thought patterns and paranoia. His third wife, Fisher, remembered his making peculiar religious comments, such as telling her that Lucifer lived down the street from him and that St. Peter was coming to take care of Lucifer. Fisher observed White talking to himself when nobody else was around.

### b.  Psychological impairments

ADOC mental health experts diagnosed White as suffering from schizophrenia and other psychiatric disorders. Although untreated Graves' disease can account for cognitive dysfunction, White's "outlandish and paranoid ideas" persisted years after he received thyroid treatment, suggesting that he suffered from both Graves' disease and psychiatric disorders.

### i. Irrational thoughts and behavior

Boettcher thought White was "insane" because at times he would place his family at risk but irrationally think they were not at risk. When Boettcher was pregnant with their third child, Jeremiah, the family lived "on the desert ground." After Jeremiah was born, they kept him by the river in a bassinet covered with a mosquito net. Boettcher insisted that they move after Jeremiah's face "turned beet red and poured sweat." Fisher recalled that White sometimes would not get medication that the doctor said was necessary for their infant son when he was extremely ill.

### ii. Paranoid thoughts and behavior

When White and Boettcher were living in Maine, White "came home one day and thought their car was being watched. They immediately left town on a bus and never went back to their apartment for their possessions."

Fisher recalled White exhibiting bizarre and paranoid behavior during the two years before David's murder. White became angry when she tried to register to vote. He told her that their lives would be over if the government found them. He always insisted on using back roads and staying off highways when they traveled. When Fisher observed White talking to himself and asked him who he was talking to, he would say, "nothing, never-mind."

### iii. Grandiose illusions and delusional thoughts

Throughout his life, White told many people, including Fisher and his first wife, Nadeen Higginson, that he was a police informant, CIA agent, or federal narcotics agent. When White met Susan, he told her he was a doctor but was

actually a nurse's aide.  Dr. Fred Markham, who examined White while he was in custody, reported that White claimed to have had four years of law school and was planning to go to medical school as soon as he went to college, though in fact he had not completed high school.  White told the probation officer that he graduated from the Florida Air Academy despite having attended for only one semester in eighth or ninth grade.

### iv.  Diagnoses while in custody

Within weeks of his incarceration, White was observed to be suffering from visual and auditory hallucinations and paranoia.  White was "sure he saw a bullet" and heard someone putting together a gun in his cell.  In October 1988, White attempted to demonstrate thought-broadcasting to a doctor.  He displayed "bizarre facial expressions" and appeared to be responding to internal stimuli.  In November 1988, an inmate reported that White seemed "around the bend" and talked to himself all day.  A March 1989 ADOC memo stated that White was suffering from "a biological mental disorder," and he was diagnosed with organic anxiety disorder.  The following month, White was taking Chlorazepam, which is used to treat seizures and panic disorders.

An ADOC psychiatrist suggested that White's "occasional bizarre behavior may well be attributed to the thyroid condition."  By August 1989, his medical records indicated that his thyroid was functioning normally following iodine treatment.  However, he continued to be diagnosed with organic anxiety disorder.

White wrote many letters to the courts and others describing ADOC's torture of him through the use of implanted devices.  He wrote letters to Boettcher and their

children, asking them not to leave him in prison because experiments were being conducted on him. He wrote to ADOC Director Samuel Lewis, Arizona Attorney General Grant Woods, U.S. Attorney Janet Napolitano, Senator John McCain, and President Bill Clinton, among others, requesting that they stop the torture. In a 1992 letter, he described witnessing the recent execution of another inmate through the inmate's eyes, which he claimed the ADOC had forced him to watch via an implanted "laser mic." White attempted to file five lawsuits against the ADOC, but each one was dismissed as "irrational and wholly incredible."

### c. Borderline intellectual functioning or low intelligence

White repeated the second and seventh grades. He received all F's in sixth grade. In seventh through tenth grades, he received 25 F's, 41 D's, 27 C's and 5 B's. White withdrew from school during eleventh grade after failing all subjects but math, in which he received a D. His IQ scores ranged from 74, associated with "Borderline Intellectual Functioning," in the ninth grade, to 91 in his second seventh grade year. On the stanine scale,[7] his scores ranged from 1, the lowest possible, to 3.2.

As an adult, White held low-skilled jobs, each of which was, according to Rohman, "essentially a repetitive, manual occupation appropriate for someone of low intelligence." These included picking mushrooms, working on a fishing wharf in Maine, washing dishes and cooking at restaurants, cleaning houses, selling rabbit fur and Native American

---

[7] A stanine score is on a nine-point scale where 5 reflects average performance relative to other pupils at that grade level. Only 4% of students have a score of 1, while 23% score at 3 or below.

jewelry, assisting as a nurse's aide, and doing odd jobs for church members in exchange for land or housing.

Except for White's relationship with Susan, his significant relationships with women "began when the women were unsophisticated and poorly educated teens." As a teenager, White fathered two children with two different women, one of whom (Higginson) he married. He married Boettcher when he was 25 and she was 18 and had just come from a childhood of abuse. He met Fisher when he was 33 and she was 19. Fisher had never left the town of Wickenberg, Arizona, and believed White when he told her that he was an undercover CIA agent. Rohman opined that White continued to have relationships "with young women with emotional and psychological problems" even as he aged because these "deficiencies . . . allowed Michael to emotionally dominate them."

Rohman asserted that White's low intelligence manifested itself in various situations throughout his adult years. White once bought a horse but left it tied to a water pipe for several days without food or water while he left town. The horse pulled the water pipe, which burst and flooded the yard. White apparently did not know his mother's correct maiden name when he married Boettcher based on their marriage certificate. When he and Boettcher moved to Oregon with their infant son, they camped out in a lean-to hoping to get squatter's rights to the property, not realizing that the homesteading law had been repealed in 1975.

Rohman also cited the facts of the offense as evidence of White's low intelligence and limited ability to reason. White shared Susan's plan for him to murder David with both Fisher and Sexton. His idea to use a potato as a silencer—which would not work, according to an expert at Susan's

trial—was apparently taken from a *Hawaii 5-0* episode. Rather than disposing of the weapon where it would not be found, he sold it to a pawn shop. He left the ski mask and bag of potatoes in his car for a week after the murder even though they linked him to the crime.

### d. Susan's culpability

Rohman recognized that the trial court found that White's greater sentence as compared to Susan's was not disparate because he was the perpetrator. Rohman focused on showing that Susan "was the motivating force and actor in this crime" because she manipulated White, who was "psychologically vulnerable and emotionally impaired."

Sexton testified at Susan's trial that White told her that "Susan had planned to kill David and she wanted [White] to do the shooting." White "tried to talk Susan out of it," telling her "it was a crazy idea." Three days later he called Susan again and she "still had the same idea." One day White told Sexton that "he just [gave] up the whole idea." Sexton thought that White was "infatuated" with Susan because "[h]e just didn't talk about anything else but [her]." Sexton believed that White would not have committed the crime if Susan had not manipulated him.

The night of David's death, Susan seemed more scared than upset. Two days afterwards, Susan's kindergarten-age daughter, Heather, told her teacher, "Mommy's kind of anxious right now." The teacher replied, "And sad?" Heather said, "Just anxious." That night, Susan went drinking with a friend. She appeared to be in a good mood. She took off her wedding rings and said, "I'm not going to get anywhere with these." She went home with the bar's bouncer, whom she had just met, and had sex with him. The following night, she told the bouncer that David was

murdered over a narcotics transaction, that the police had arrested an old boyfriend of hers, but that he was innocent and a federal narcotics agent was working with her to clear him.

Several people described Susan as manipulative and a liar. James Clubb, a high school classmate, described her as very manipulative—the "kind of person who would go out and get what she wanted no matter what." Susan testified that she was originally going to blame the crime on her own brother. Hammond, the prosecutor, believed that she clearly "was the instigator and she kept pushing . . . White until he made up his mind to kill her husband."

### e.  Family history of violence and criminality

White's natural father could be aggressive and hostile. He was expelled from junior high school for fighting with a student and hitting a teacher with a chair. As an adult, White's father was followed home from a bar by the police after he got into a fight there. One time he became angry when White's mother did not immediately clear the dishes from the dining table after he finished eating. He kicked the dinner table across the room and ordered her to pick it up.

One of White's stepfathers, Eugene Perlow, frequently struck White with his hands and a belt while bending him over a chair. Once when White reached across the dinner table, Perlow back-handed him, knocking him to the ground. White's mother became upset, and White ran away from home for the first time.

One of Perlow's sons, six years White's senior, was abusive to him. They would play a game called "who could hit the easiest." White usually lost and wound up hurt. He recalled getting hit in the shoulder and nose, which left scars.

Once, this stepbrother locked White in the trunk of a car and left him there while he went to a drive-in movie. White's behavioral problems started around the time he was exposed to his violent step-family. Perlow was stricter with White than with his own children, but White's mother generally did not intervene.

White's uncle unsuccessfully tried to kill a truant officer with six sticks of dynamite and later went to prison for robbery. White's first cousin is serving a life sentence for first degree murder.

### f. Family history of alcoholism and substance abuse

White's maternal grandfather was a violent, abusive alcoholic who died of cirrhosis of the liver. White's uncle died of alcohol-related issues. White's first cousin also had a history of using alcohol, marijuana, cocaine, heroin, and methamphetamines. He was arrested for selling rock cocaine and possessing paraphernalia. He committed four misdemeanors as a child and was jailed on three occasions. White's mother was addicted to prescription medication while he was a baby and toddler. White's stepfather Millard Forrester was an alcoholic who would have screaming arguments with his mother.

White first experimented with drugs around the age of 14. By the age of 19, he smoked marijuana on virtually a daily basis. White reported being high on marijuana almost daily during his trial. He also used LSD, cocaine, heroin, and methamphetamines. Around the age of 25, he moved to San Francisco, where he became addicted to heroin and contracted Hepatitis C.

White believed that his use of LSD, cocaine, and marijuana contributed to the demise of his first marriage to Higginson, since he refused her requests to go to counseling. His second wife, Boettcher, thought he did not like life and that he needed the drugs to live with himself. When sober for a few months, White "seemed like he could be a decent person," but once he began using again he would become irritable and abusive if he ran out of the drugs.

### g. Family instability and lack of a father

Between the ages of one and thirteen, White had four different father figures. His birth parents separated when he was 18 months old. Around this time, his mother met George Willard, a customer at the restaurant where she worked. White's mother became pregnant with Willard's son, Michael's half-brother Norman. White, his mother, and Norman moved in with Willard and Willard's daughter from another relationship. After White's mother and Willard separated a year later, Norman maintained a relationship with Willard but White was not allowed to do so.

White's mother married Forrester when White was about three years old. Forrester regularly took them on camping, hunting, and fishing trips. White felt like they were building a family and called Forrester "Dad." After three or four years, the marriage ended due to Forrester's alcoholism. White was not supposed to talk to Forrester after that, but he recalled running up to him at school one day to talk to his "Dad."

Around the time of the divorce, White was diagnosed with stomach ulcers from "nerves," which stopped after two years of medication and a restricted diet. White thought the ulcers were caused by family stress.

When White was 13, his mother married Perlow, who was her much older supervisor. He brought two of his children from a former marriage into the home, and they received preferential treatment. White and Norman felt like outsiders in the family.

Throughout his life, White talked about finding his natural father. White asked his mother for help, but she refused. As a teenager, White went to California to search for him. Higginson recalled that at age 21, White insisted that she call him by his father's name, "Ray."

### h. Neglectful parenting

White suffered a broken collarbone at age two, reportedly from falling off a picnic table. His arm needed to be kept in a sling, but his mother failed to ensure that this happened. At the age of four, White suffered a severe head injury from striking his head while running around a pool. His mother did not take him to a doctor. White still has a dent in his forehead from this incident. Around the same age, he slipped on wet wood and sustained a hairline fracture to his hip. White's mother smoked cigarettes throughout her pregnancy with White which, according to Rohman, may have contributed to White's low intelligence and childhood behavioral problems.

White was asked to step into an adult role as a very young child. Around the age of five, he was made responsible for caring for and feeding Norman, who was in diapers at the time, while his mother was at work. After his mother and Forrester divorced, when White was seven years old, his mother told him that he was now the "man" of the family.

White's mother was lax in disciplining White and generally ignored his misbehavior. She also neglected his education and did not insist that he go to school. The family moved frequently, forcing White to attend several different schools—three for second grade alone. When he had to repeat seventh grade, his mother did not seek tutoring help.

Boettcher, White's second wife, recalled that White's mother favored Norman over White. White's mother was very critical of and "cold" to White. She told him that she had become "higher class" than when he was a child and did not want him to "ruin their name."

### i. Transience

Rohman believed it "may be impossible to know how many times [White] moved from house to house, and community to community as he was growing up." White lived, at a minimum, with his birth father in Los Angeles, with maternal uncles and cousins for approximately a year after the separation, with Willard and his daughter for a year, in and out of various relatives' homes for several years after that relationship ended, with Forrester for three to four years, again with various relatives after that divorce, and in numerous homes with Perlow and his children. White attended at least 10 different schools from kindergarten through high school, and there were "gaps of several grades" where Rohman was "unable to even identify what school he attended."

### j. Head injury

Rohman opined that the head injury White sustained from running around the pool when he was four years old likely caused him damage to his brain. The dent in White's forehead indicated that White took the brunt of the fall with

the front of his head, potentially wounding his frontal lobe. Rohman cited evidence that frontal lobe injury can cause behavioral and personality abnormalities, such as impulsivity, aggression, poor judgment and insight, poor self-regulation of behavior, mood swings, attentional and memory deficits, amotivation, apathy, and disorganization.

### k.  Hyperactivity

White displayed many symptoms of Attention Deficit Hyperactivity Disorder ("ADHD") as a child. As early as kindergarten, White's teachers reported they could not keep him in his seat long enough to focus on schoolwork. At home, White was a very nervous child with little impulse control. White recalled being jittery for as long as he could remember. His writing was impaired by shaky hands, a symptom of Graves' disease. White had trouble concentrating in school. Around the time he was in second grade, White's mother took him to a counselor or psychologist for these problems. Without testing White, the counselor diagnosed him as hyperactive, recommending medication and opining that White would eventually "grow out of this behavior." White's mother refused to medicate him and stopped taking him to the counselor after several visits because she "did not see any progress." This was the only mental health-related treatment that White received as a child.

### l.  Inability to support himself and poverty

Higginson, White's first wife, recalled that White could not earn enough to support her and their son, Shawn. She believed that the pressure of this failure caused White to leave them when Shawn was four years old.

White and Boettcher, his second wife, moved to Wisconsin to live on a farm. White was supposed to make monthly payments to Boettcher's father, who had taken out a loan for the farm. White was never able to do so, and after eight months he and Boettcher were forced to move away.

White traded in a trailer for two mules, a harness, and a wagon. After he converted the wagon, he took Boettcher and their two kids back to Wickenberg, Arizona, to two gold claims. In addition to the mules, White had horses, chickens, goats, and dogs. They had no running water where they lived, so they hauled it. While White looked for work, Boettcher would stay in the truck with the kids in the desert. Boettcher eventually got a job working as an aide at a hospital.

White and Boettcher lived mainly on charity during this time. They were extremely poor, living by the riverbank in a tent and sleeping on the ground in the dirt. Because there was no water in the river, the family was always filthy. When Boettcher went into labor with their third child, the pastor's wife and other people from the church cleaned her up and took her to the hospital.

White and Fisher, his third wife, lived in Texas for months without a bed while she was pregnant. They slept on the floor of a room. They stayed in "rundown hotels," usually the cheapest in town.

In mid-1987, the pastor of a church in Prescott gave White rides to and from church and fed him. White "seemed like a loner" and down on his luck. He always sat by himself at church, dressed shabbily. He once worked in the pastor's yard for money. Shortly before the murder, White was sleeping on the floor of an upholstery shop and showering at Sexton's home.

### m. Inability to maintain relationships

In high school, White began dating Joan Quinn when they were around 15 years old. Quinn became pregnant, and her parents forced her to give the baby up for adoption and forbade her from talking to White. White recalled having only one other friend in high school.

White met Higginson when he was 19 years old. Higginson did not think White had any friends of his own during their four years together. Although White blamed the failure of their relationship on his drug problem, Higginson believed it was caused by his inability to support the family financially or deal with issues in their marriage. When White and Higginson's son Shawn was 12, White went to Oregon to visit him. He wanted Shawn to know that he had a father, because White never saw his own father. White spent only a couple of hours with Shawn and called it a "nice visit."

White met Boettcher in San Francisco. They began doing drugs together and traveling around the United States. During the eight years they were together, White never maintained any long-term friendships with others. He was extremely possessive of her. He would bring home the groceries so that she had no reason to leave the house without his permission. They moved frequently. White would sometimes come home and tell her they were leaving that day. They were married in Wisconsin, and their children were likely born in South Carolina, Arizona, and California. Even when they accepted charity from the church in Wickenberg, White and Boettcher remained isolated from the community.

White and Fisher met in 1985 while working together at a nursing home. They left together to travel around the

country. They returned to Arizona, had two children, and were married in December 1986. White met Susan the following month. He wanted to build a stable family with Susan and never seemed to leave her side while they were together in Michigan.

### 4. Further denial of funding for a neuropsychologist and changes of counsel

After Goldberg withdrew from the representation to pursue a nursing degree, the Arizona Supreme Court appointed Thomas Gorman to replace him. Gorman, who also later withdrew, felt that White was "clearly presently mentally ill and not presently competent or able to assist in his case in any way." Gorman believed that White's claims involved "complex medical and psychological issues never previously presented to any court" and required "consultation with experts."

After attorney Kerrie Droban replaced Gorman as White's counsel, she renewed Goldberg's motion to fund a neuropsychologist on the ground that a comprehensive neuropsychological evaluation was necessary to establish White's ineffective assistance of counsel claim and bolster the mitigation expert's findings. The court denied the motion without explanation.

### 5. Evidentiary hearing

The superior court held an evidentiary hearing on November 5, 2007, at which McVay and Rohman testified.[8]

---

[8] Droban attempted to examine a third witness, John Sears, to testify "about the general standards for capital defense litigation and the particular funding issues relative to this case." The court denied

### a. Resentencing counsel McVay's testimony

McVay became involved in White's case when he encountered a lawyer who told him that Judge Hancock was looking for a PCR lawyer with death penalty experience. At the time, McVay's practice involved "[m]ostly [criminal] appeals" with "a substantial domestic relations component." He was unsure whether, prior to White's case, he had had any experience with capital sentencing proceedings or had read the applicable 1989 American Bar Association guidelines for capital litigation ("ABA guidelines").

The only other person McVay hired to work on White's case, an investigator, was a former police officer who had no known specialization in mitigation evidence. McVay did not hire a mitigation expert because he "felt that the investigator that [he] had was sufficient to the purpose." He did not recall reviewing the transcript of Susan's trial prior to White's resentencing. He spoke with White's trial counsel, Lockwood, but "not at considerable length."

McVay recalled receiving "a number of letters" from White about biotelemetry implants in his brain but did not order copies of White's medical or psychological records from the ADOC because he "just flat didn't think of it." McVay was unaware that ADOC records diagnosed White with "a biological mental disorder," Graves' disease, and a thyroid problem that may cause occasional bizarre behavior, and documented White's complaints of auditory hallucinations, his observed "bizarre facial expressions" that

Droban's request without explanation. The court also denied Droban's renewed motions for funding for a neuropsychologist, a rehabilitation expert, a lethal injection expert, and a defense investigator.

seemed "to be responding to internal stimuli," and, according to another inmate, his talking to himself all day.

Although it occurred to McVay that White did not genuinely believe his claims of brain implants, McVay had no strategic reason not to request the ADOC records. McVay stated that in hindsight, he should have obtained the records and requested a mitigation specialist.

McVay assumed that his investigator would have obtained White's school records, but he never saw them and was unaware that White's IQ had been measured at 74. He had no strategic reason not to request the school records. McVay felt White's life circumstances and social history did not warrant further investigation based on "the facts of the case," "some information [he received] from the investigator," and the few times he spoke with White.

While aware of his duty to contest aggravating factors, McVay thought he had stipulated to the existence of the pecuniary gain aggravating circumstance because "the issue was resolved on the [first] direct appeal." He thought the Yavapai County Attorney's policy of seeking the death penalty whenever there was any evidence of an aggravating circumstance "was so offensive and such [an] abandonment of what . . . their prosecutorial role should be that . . . it would be extremely persuasive."

### b. Mitigation expert Rohman's testimony

Rohman testified that a mitigation investigation proceeds without an agenda, "looking for signs of mental, emotional, [or] physical impairments that might impact [the defendant's] conduct [and] development," as well as any other relevant evidence. He attempted to corroborate

mitigation evidence from multiple sources to strengthen the presentation.

A mitigation specialist uses the information collected to identify other experts that may be useful, such as psychologists, psychiatrists, and neuropsychologists, who in turn use it in their own investigations and as the basis for their testimony. In 1996, it was standard for defense counsel in capital litigation to follow the recommendations of the ABA guidelines, including the use of mitigation specialists.

Based on Rohman's review of the ADOC records and White's other medical records, he recommended obtaining a medical expert in hyperthyroidism and Graves' disease, a psychiatrist or psychologist to look at how the illness impacted White's life, and an expert in special education needs to evaluate the disease's impact on White's developmental history and educational background. Regarding the effects of White's low IQ, Rohman believed an expert in the area of learning disabilities, mental retardation, and particularly neurology, would be appropriate.[9] In Rohman's nearly two decades of work on capital litigation, this was the only case in which a mental health professional was not appointed.

---

[9] The PCR court repeatedly stopped Rohman from offering an opinion as to how White's background, symptoms, and diagnosed afflictions could potentially affect his behavior on the ground that Rohman was unqualified. Yet in finding that there was no prejudice from McVay's failure to investigate and present evidence of White's hyperthyroidism, the PCR court stated that it "would have concluded that [the] symptoms did not contribute to his conduct."

### 6.  PCR court's decision denying White's petition

The PCR court summarily denied relief and dismissed the petition.  On March 24, 2008, the court adopted the state's proposed findings of fact and conclusions of law.  It found that "White did not make the showing necessary to obtain a neuropsychologist"—"that his sanity would be or was a significant factor in his defense"—because there was no evidence that he was mentally impaired when he murdered David.  The court concluded that White "failed to show that any impairment would carry significant weight in mitigation and failed to show that impairment as alleged would play a significant role in his defense against the death penalty."

As for McVay's failure to challenge the pecuniary gain aggravator, the court concluded that it "was based on sound trial strategy" and McVay's representation was reasonable under the circumstances; that "[t]here was no reasonable probability that this Court would not have found the aggravator proven had McVay challenged it with the proffered evidence"; and that "[t]he State was not required to prove that pecuniary gain was White's exclusive motive for killing [David]."  Therefore, McVay neither performed deficiently nor prejudiced White.

The court next turned to the various types of mitigation evidence that White asserted McVay should have presented and one by one rejected them as a basis for granting White's PCR petition.  The court determined that McVay either had no reason to investigate the mitigation evidence or made a strategic decision not to do so.  For each category of mitigation evidence, the court stated that even if it had considered the evidence, the evidence was insufficient to call for leniency and the court would have imposed the same sentence.

The Arizona Supreme Court denied review of the PCR court's decision on October 28, 2008.

## F.  Federal habeas proceedings

White filed a habeas petition in the district court on December 22, 2008.   The district court stayed the proceedings pending a competency determination. Following White's examination by a court-appointed expert, the parties stipulated that he was incompetent to assist counsel.   White was transferred to the Arizona State Hospital, but a disagreement between the hospital and an ADOC doctor prevented the development of a restoration plan.

Later, the Supreme Court held that a stay of federal habeas proceedings on account of a petitioner's incompetency is inappropriate if "there is no reasonable hope of competence."  *Ryan v. Gonzales*, 568 U.S. 57, 77 (2013).  In light of *Gonzales*, the district court lifted its stay, and denied White's amended petition on July 10, 2015.

### III.  Jurisdiction and Standard of Review

We have jurisdiction under 28 U.S.C. § 2253(a), and we review the district court's denial of habeas relief de novo. *Earp v. Davis*, 881 F.3d 1135, 1142 (9th Cir. 2018).  Because White filed his federal habeas petition after April 24, 1996, it is subject to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Murray v. Schriro*, 745 F.3d 984, 996 (9th Cir. 2014) (citing *Valerio v. Crawford*, 306 F.3d 742, 763 (9th Cir. 2002) (en banc)).

Under AEDPA, we may not grant habeas relief on White's ineffective assistance claim unless the state court adjudication of it "was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).  In making this determination, we look to the last reasoned state court decision to address the claim.  *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  Here, the last such decision was the PCR court's March 24, 2008 findings of fact and conclusions of law.

## IV.  Discussion

The clearly established federal law governing ineffective assistance of counsel claims is *Strickland*.  *See Cullen v. Pinholster*, 563 U.S. 170, 189 (2011).  To meet that standard requires a showing that counsel performed deficiently in a way that prejudiced the defense.  *Strickland*, 466 U.S. at 687.

## A.  Deficient performance

Deficient performance means that "counsel's representation fell below an objective standard of reasonableness" as measured by "prevailing professional norms."  *Id.* at 688.  Given the "countless ways to provide effective assistance in any given case," we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  Our examination of counsel's performance "must be highly deferential," *id.* at 689, and when conducted through AEDPA's lens our review is "doubly deferential," *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (quoting *Yarborough v. Gentry*, 540 U.S. 1, 5–6 (2003) (per curiam)).

### 1. McVay's failure to challenge the aggravating factor

The PCR court, citing *Strickland*, concluded that McVay's failure to challenge the pecuniary gain aggravator was "based on sound trial strategy." It was clear, however, that McVay did not make a strategic choice. Rather, his decision not to challenge the State's evidence that White acted for pecuniary gain was based on his erroneous belief that "the issue was resolved on the [first] direct appeal." A decision based on a misunderstanding of the law is not sound trial strategy. *See Strickland*, 466 U.S. at 690–91 (requiring deference only to "strategic choices made after thorough investigation of [the] law" or after reasonable professional judgment not to investigate); *see also United States v. Span*, 75 F.3d 1383, 1390 (9th Cir. 1996).

At resentencing, the parties were entitled to present new arguments and evidence regarding the pecuniary gain factor and the court was required to find anew that the state had established the factor before reimposing the death penalty. *See* Ariz. Rev. Stat. § 13-703(C), (E) (1996); *State v. Rumsey*, 665 P.2d 48, 53 (Ariz. 1983) (stating that the statute governing capital sentencing procedure at least presumptively applies on resentencing, entitling the parties "to introduce new contentions or evidence with regard to aggravating circumstances"), *aff'd*, 467 U.S. 203 (1984). In once again finding the pecuniary gain aggravator, the court commented on the lack of evidence to alter its original finding. There was no strategic reason for McVay not to have challenged the pecuniary gain factor.

In concluding that McVay acted reasonably, the PCR court relied on our decision in *Coleman v. Calderon*, 150 F.3d 1105, 1113 (9th Cir.), *rev'd on other grounds*, 525 U.S. 141 (1998) (per curiam). *Coleman* does not

support the PCR court's decision.  The claim in *Coleman* was that counsel "failed to properly investigate the physical evidence."  150 F.3d at 1113.  We observed that "[i]n any given case . . . , one would expect an attorney to examine the physical evidence, especially in a prosecution involving the death penalty."  *Id.*  Yet the attorney's performance was not constitutionally deficient in part because he hired an expert to examine the evidence.  *Id.*  Here, McVay made no attempt to uncover—let alone examine—evidence rebutting a pecuniary motive.

### 2. McVay's failure to investigate and present mitigating evidence

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 691.  McVay initially "anticipated that a substantial effort must be made to unearth all mitigating circumstances."  Yet he failed to investigate any mitigating circumstances relating to White's background despite having ample time to do so.

For example, McVay did not order White's readily obtainable medical and other records from his time in custody.  Normally, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  *Id.*  But that presumes counsel *made* a judgment not to investigate.  The state court was well aware that McVay did not.  McVay testified that he had no strategic reason for not acquiring White's records.  When asked why he did not obtain them, he testified that he "just flat didn't think of it."  We "may not indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions."

*Harrington v. Richter*, 562 U.S. 86, 109 (2011) (quoting *Wiggins v. United States*, 539 U.S. 510, 526–27 (2003).

McVay knew that White's mental health was an issue. The record, which McVay should have reviewed, was filled with evidence that White suffered from mental illness. Before trial, Lockwood requested a competency hearing because he "strongly suspect[ed]" that White "would not be able to adequately assist defense counsel" on account of his "strange behavior." White's first appellate counsel, Williams, also requested a competency hearing because White appeared to be "suffering from a severe mental disease or defect which renders him incapable of assisting counsel." The Arizona Supreme Court discussed appellate counsel's assertion that "after [White] was sent to prison, he began exhibiting bizarre behavior." *White I*, 815 P.2d at 883. *White I* dismissed White's claim that this behavior may have been "the result of a mental impairment that predated the murder" due to the lack of a record on direct appeal. *Id.* The state supreme court advised White that he "may present this issue for determination by the trial court" in a PCR petition. *Id.*

At the first PCR hearing, McVay elicited testimony from Lockwood that White's appellate counsel thought "White must have some type of either emotional problem or health-related problems" because of his behavior, and Lockwood realized that White's "mannerisms" in fact "were psychological or physiological for him." Lockwood expressed regret because he "definitely . . . should have . . . developed [a] psychological[]" mitigating circumstance. And McVay should have suspected something was wrong when he received "a number of letters" from White about the biotelemetry implants in his brain.

The PCR court found that "White behaved normally and rationally during face-to-face meetings with [McVay]." That White *sometimes* behaved normally is irrelevant when, as McVay told the court ten months before the resentencing, "sometimes [White] did not appear . . . close to being lucid." To the extent the PCR court found that White always behaved normally in front of McVay, that was an unreasonable factual determination. It was also irrelevant given the substantial evidence that McVay had from other sources regarding White's questionable mental health.

The PCR court found that McVay "questioned whether White truly believed the accusations he made in correspondence." At the second PCR hearing, more than a decade after the events in question, McVay agreed that it had "cross[ed] his mind" that White may not genuinely have believed that he had implants in his brain because McVay recalled him behaving normally on the few occasions they met. But McVay at least suspected that White might have mental health issues worth investigating, because he directed his investigator to speak with White's mother "regarding her capability in affording a mental examination," which McVay and his investigator had "spoke[n] about."

While McVay's skepticism about White's letters and the possibility of malingering was understandable, McVay was not a neutral factfinder—he was an advocate. Given the substantial evidence from multiple sources that White may have mental health issues and the possibility that such issues would have a mitigating effect on his sentence, it was unreasonable of McVay not to investigate further or request funding for an expert investigation.

The PCR court concluded that McVay "was not required under *Strickland* to request White's mental health records absent some suggestion that they might contain information

with mitigating value." The court's factual premise was unreasonable given the evidence of White's mental illness. Moreover, even if there had been no readily available evidence, McVay had an obligation to thoroughly investigate White's background, and his decision not to do so was unreasonable. "It is unquestioned that under the prevailing professional norms [in 1988, four years before McVay began representing White], counsel had an 'obligation to conduct a thorough investigation of the defendant's background." *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)) (reviewing de novo); *see also Robinson v. Schriro*, 595 F.3d 1086, 1108–09 (9th Cir. 2010) ("Certain forms of investigation are fundamental to preparing for virtually every capital sentencing proceeding. At the very least, counsel should obtain readily available documentary evidence such as school, employment, and medical records, and obtain information about the defendant's character and background." (citing *Boyde v. California*, 494 U.S. 370, 382 (1990); *Ainsworth v. Woodford*, 268 F.3d 868, 877 (9th Cir. 2001))).

Medical history, including any mental illness, is the first category that the 1989 ABA Guidelines direct counsel to consider presenting at a mitigation hearing. The guidelines direct counsel to make "efforts to discover all reasonably available mitigating evidence," including medical and mental health evidence. 1989 ABA Guidelines § 11.4.1(C), (D)(2)(c). The commentary admonishes counsel not to "sit idly by, thinking that investigation would be futile."

The Supreme Court has "long . . . referred [to the ABA guidelines] as 'guides to determining what is reasonable.'" *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (quoting *Wiggins*, 539 U.S. at 524). In *Rompilla*, the Court

specifically highlighted the 1989 guidelines "devoted to setting forth the obligations of defense counsel in death penalty cases." *Id.* at 387 n.7. Here, as in *Rompilla*, we have been presented with no "reason to think the [relevant ABA] standard impertinent." *Id.* at 387.

The PCR court turned counsel's obligation to investigate on its head. It is one thing for counsel to decide not to investigate further if counsel has made some effort and there is reason to believe further effort in a particular area would be fruitless. "Questioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there." *Id.* at 389; *see also id.* at 383 ("[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."). Here, however, "counsel did not even take the first step of interviewing witnesses or requesting records." *Porter*, 558 U.S. at 39; *cf. Rompilla*, 545 U.S. at 381 (observing that "a number of counsel's choices in this case are subject to fair debate" in contrast to "a case in which defense counsel simply ignored their obligation to find mitigating evidence").

The State points out, with respect to the hyperthyroidism investigation, that "Judge Hancock found that White had informed the court in his pro per sentencing memorandum that he suffered from this condition and there was no evidence that White told McVay about that condition or asked him to proffer it as mitigation." The state contends that the reasonableness of McVay's actions "may be determined or substantially influenced" by White's own actions. *Strickland*, 466 U.S. at 691. This quotes *Strickland* out of context. "Counsel's actions are *usually* based, quite properly, on informed strategic choices made by the

defendant and on information supplied by the defendant." *Strickland*, 466 U.S. at 691 (emphasis added). In the usual case, "when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation *may* be considerably diminished or eliminated altogether." *Id.* (emphasis added).

Here, there is no evidence that McVay relied on White's statement to the court about his Graves' disease when deciding whether to *investigate*. White submitted that statement to the court five days before he was resentenced, whereas McVay had been preparing for the resentencing for more than four years. White's claim of having Graves' disease was only one of many claims in his memorandum. Most were fantastical, such as his claim that he was being tortured by biotelemetry implants. Even if McVay had believed that White had Graves' disease, McVay "[did]n't know what Graves' Disease is." At a minimum, he would have needed to hire an expert to explain Graves' disease and how it can potentially affect someone in White's circumstances. As the PCR court repeatedly pointed out, even a mitigation specialist (which McVay did not hire) is unqualified to make those assessments. In Rohman's nearly two decades of experience in death penalty mitigation, he had never before seen a case in which a mental health professional was not appointed.

The State cites the reasonable performance in *Strickland* where the "attorney did not conduct any extensive interview of family and friends." In *Strickland*, however, "[t]he aggravating circumstances were utterly overwhelming" and "counsel could reasonably surmise from his conversations with [the defendant] that character and psychological evidence would be of little help." 466 U.S. at 699. Here, in

contrast, there was only one aggravating factor and the evidence of it was fairly weak. Evidence of mental health and other problems in White's life would certainly have been important. And it was unreasonable to surmise that further investigations into White's mental health would have been of little help based solely on a few uneventful interactions with him in light of the considerable evidence known to McVay that White likely suffered from mental health issues.

In *Strickland*, moreover, the attorney's strategy reasonably "ensured that contrary character and psychological evidence and respondent's criminal history, which counsel had successfully moved to exclude, would not come in." *Id.* Here, McVay had no countervailing strategic reason to think that mental health and other background evidence might harm White's case. Its usefulness simply did not occur to him.

Strickland's counsel chose a reasonable strategy "to rely as fully as possible on [the defendant's] acceptance of responsibility for his crimes" given the court's "well known" views on its importance. *Id.* McVay adopted a strategy of blaming the victim's death on the attending medical personnel notwithstanding that it was, he acknowledged, "a problematical issue" given "the look on the Court's face."

In *Porter*, the Supreme Court concluded that counsel— who had just "a little over a month prior to the sentencing proceeding" for the investigation—was deficient because "[h]e did not obtain any of [the defendant's] school, medical, or military service records or interview any members of [the defendant's] family." 558 U.S. at 39. As here, counsel also "ignored pertinent avenues for investigation of which he should have been aware." *Id.* at 40. The only difference is that McVay had far longer to investigate this type of

evidence, and his failure to do was correspondingly more egregious.

Although *Strickland* was applied de novo in *Porter* rather than with AEDPA deference, it is hard to see how even with the requisite deference to the PCR court McVay's failure to investigate was reasonable. As in *Wiggins*, which applied AEDPA deference in deeming counsel's performance deficient, the investigation was largely limited to the presentence report. *See Wiggins*, 539 U.S. at 524 (faulting counsel for "abandon[ing] their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources"). "In assessing the reasonableness of an attorney's investigation . . . , a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527.

McVay's failure to investigate and present mitigating evidence, as well as evidence rebutting the State's evidence of pecuniary gain, was objectively unreasonable in light of *Strickland* and *Wiggins*. The PCR court's contrary conclusion was an unreasonable application of those cases.

## B. Prejudice

"In assessing prejudice [under *Strickland*], we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. Prejudice requires "a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. A "reasonable probability" means "a probability

sufficient to undermine confidence in the outcome." *Id.* at 694.

The PCR court's prejudice determination was contrary to *Strickland* in two respects. First, the court determined whether *it* would have imposed a death penalty if it had considered the mitigation evidence that McVay failed to present. However, the test for prejudice is an objective one. *See Strickland*, 466 U.S. at 695 ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncrasies of the particular decisionmaker . . . ."). It considers the likelihood of a different result not just by the trial court but by an appellate court that "independently reweighs the evidence." *Id.* The Arizona Supreme Court "is required" to conduct "an independent review of the death penalty as imposed." *White II*, 982 P.2d at 829. The PCR court erred by applying a subjective test of prejudice that failed to consider the probability of a different outcome in the Arizona Supreme Court.

The PCR court's prejudice determination was also contrary to *Strickland* because the court analyzed prejudice separately for each of 12 different types of mitigating evidence that McVay failed to present rather than considering the prejudice resulting from the omission of this evidence in the aggregate. The test is whether it is reasonably likely that the result of the proceeding would have been different but for counsel's "error*s*." *Strickland*, 466 U.S. at 694 (emphasis added). In reweighing the aggravating and mitigating evidence, a state court's failure "to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence

adduced in the habeas proceeding"—is an unreasonable application of *Strickland*'s prejudice test.   *Williams*, 529 U.S. at 397–98.

The State argues that the PCR court's consideration of the cumulative mitigating evidence is implicit in its ruling because the court recited "the totality of the mitigation that [it] had considered during the course of the case."  But the State is referring to the procedural history portion of the ruling in which the court set forth the mitigation evidence it *previously* had considered at resentencing.  Nowhere in its ruling did the PCR court state that it was considering the totality of the mitigating evidence that McVay should have presented.  It did not even set forth a correct statement of the law suggesting it was applying the correct standard despite the appearance to the contrary.

The PCR court's analysis of prejudice was flatly inconsistent with its considering the mitigation evidence cumulatively.  For example, in rejecting the claim that McVay should have investigated evidence of Susan's relative culpability, the court gave only one reason for determining there was no prejudice: "White has failed to show prejudice because this Court did in fact consider the exact evidence in finding that White's conduct was more egregious that Susan's."  That would hardly be a sufficient reason for a lack of prejudice if the court were weighing all of the evidence McVay should have uncovered against the aggravating factor.  More generally, there was no reason for the court to engage in 12 separate prejudice analyses if it were truly assessing the cumulative impact of counsel's errors.  With respect to each type of mitigating evidence, the PCR court concluded that, had the evidence been presented, the court would have found it insufficient to call for leniency.

Because the PCR court applied a test for prejudice contrary to *Strickland*, we do so independently without AEDPA deference. *See Crace v. Herzog*, 798 F.3d 840, 846, 850 (9th Cir. 2015). "This is not a case in which the new evidence 'would barely have altered the sentencing profile presented to the sentencing judge.'" *Porter*, 558 U.S. at 41 (quoting *Strickland*, 466 U.S. at 700). The judge at White's resentencing "heard almost nothing that would humanize [White] or allow [the court] to accurately gauge his moral culpability." *Id.* The court heard only that the prosecutors did not personally view this as a death penalty case; White had no prior felony convictions; White believed himself capable of being rehabilitated (in part because he had no prior felony convictions); and Susan was at least as culpable. In fact, White's sentencing memorandum acknowledged that White "claimed that his childhood was normal." The court was "left to wonder about that conclusion" and informed only that White's "natural father left the home when [White] was 18 months old and his first stepfather was an alcoholic."

McVay's presentation of mitigating background evidence did not discuss White's four father figures, the physical and emotional abuse and neglect that he suffered growing up, and the poverty, transience, and difficulties forming relationships that he experienced throughout his life as related by his family and three ex-wives. Nor did the court hear about White's childhood IQ test score in the "Borderline Intellectual Functioning" range and his dismal performance in school when he was even able to attend. This "graphic description of [his] childhood, filled with abuse and privation, or the reality that he was 'borderline [intellectually disabled],' might well have influenced the [court's] appraisal of his moral culpability." *Williams*, 529 U.S. at 398 (citing *Boyde*, 494 U.S. at 387); *see also Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (discussing "the belief, long held by this

society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse" (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring))), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).

Moreover, White's schizophrenia (or biological mental disorder), Graves' disease, and possible ADHD were not presented to the sentencing court at all. Because the state courts steadfastly refused funding for experts who could explain the likely effect of these issues, alone or in combination, at this stage we can only speculate how these factors might have impacted White's decision to commit the crime. Regardless, they are independently relevant as "the kind of troubled history [the Supreme Court has] declared relevant to assessing a defendant's moral culpability." *Wiggins*, 539 U.S. at 535 (citing *Penry*, 492 U.S. at 319).

"On the other side of the ledger, the weight of evidence in aggravation is not as substantial as the sentencing judge thought." *Porter*, 558 U.S. at 41. There was only one aggravating factor—that White committed the murder for pecuniary gain. Even without McVay attempting to rebut this finding, two out of the five justices on the Arizona Supreme Court in *White II* felt that it was insufficient to warrant death. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696.

Evidence from multiple sources showed that Susan repeatedly pressured White into perpetrating the crime on her behalf and that White struggled with the decision but eventually agreed because he was infatuated or in love with

her. Susan was described as manipulative and a liar; White as psychologically vulnerable and emotionally impaired. Susan was the one who, days before marrying a man while seeing White on the side, contacted insurers to arrange a payoff from the murder of her soon-to-be husband.

Susan herself made statements suggesting White acted out of love rather than pecuniary gain. As the PCR court found, "Susan made statements to police asserting that White did not expect to receive a portion of [David's] insurance proceeds and killed [David] because [David] had abused Susan." Although she gave contradictory testimony at her own trial suggesting White was interested in the money, this could have been discredited as a self-serving story concocted after the fact to shift blame onto White.

The strongest evidence of White acting out of a pecuniary motive was his statement to Fisher indicating he expected Susan to give him $100,000, presumably from the insurance proceeds. While this statement supported the pecuniary gain finding, it was not unambiguous. Clearly, White expected that Susan was going to share the insurance proceeds with him. But a neutral factfinder could have reasonable doubts as to whether the insurance funds were a causal factor in White's agreeing to commit the murder or whether he simply succumbed to Susan's pressure because he loved her. *See Madsen*, 609 P.2d at 1053 ("[T]he receipt of the [insurance] money must be a cause of the murder, not a result of the murder."). A finding that White acted solely out of love because Susan manipulated him would have been considerably more likely if the sentencer had learned of White's troubled background, mental health issues, and low intelligence. Consequently, there is a reasonable likelihood White would have received a different sentence if McVay had investigated and presented mitigating evidence.

## V. Conclusion

The Sixth Amendment guarantees that criminal defendants receive reasonably effective assistance of counsel at sentencing. *See Strickland*, 466 U.S. at 686–88. The PCR court's determination that White received what the Constitution requires was both contrary to and an unreasonable application of *Strickland*. White is therefore entitled to habeas relief. Accordingly, we reverse the district court's judgment and remand with instructions to grant a conditional writ with respect to White's sentence unless the State, within a reasonable period, either holds a new sentencing hearing or vacates White's sentence and imposes a lesser sentence in accordance with state and federal law.

**REVERSED and REMANDED.**